Good morning, Mayor and Police Department. I'm Thomas Griffin and I represent the appellant Douglas Clabaugh. The crux of the issue here is whether there was a lack of process before Mr. Clabaugh was terminated. Specifically, whether he was given a meaningful hearing. He was not given a meaningful hearing for two reasons. First, he had an attorney present, but his attorney wasn't allowed to represent him in a manner that safeguarded his interests. And second, he wasn't able to adequately prepare for the hearing because he was given materially relevant documents and recordings about five minutes before the hearing started. Okay, so let's go to that first point that you've made with regard to it. So, what requires him to be able to have an attorney represent him and what's the extent of that representation at the hearing? There are a few cases that you have to look at together. And I'm not aware of a case in an employment law context for a post-termination hearing that says you get representation of counsel and representation of counsel means this. But there's a United States Supreme Court case, a Ninth Circuit case, a state of Arizona case, and a district of Nebraska case that we need to look at together. The U.S. Supreme Court case is Goldberg v. Kelly. That's like, that quotes the Powell v. Alabama. And it states that the right to be heard would in many cases be of no avail if it didn't contemplate the right to be heard by counsel. Right, so it didn't actually give them, though in an administrative hearing, a right to have an attorney represent and cross-examine and so forth. And, in fact, in this case, the letter said that he might be able to have a representative. I mean, he has a right to be a representative, may be permitted to ask questions and examine the witnesses. And he had Ms. McDonald next to him the entire time he was able to consult with her. I mean, so what's the violation of any rights that he had? He had Ms. McDonald present. And what the district court says in its opinion in the motion for summary judgment is that you're entitled to the assistance of counsel. The district court didn't address what assistance of counsel means. But you're saying he didn't have assistance of counsel at this hearing? I think he had minor assistance of counsel. I don't think he had representation of counsel as required by the law. And this court, didn't his counsel have the right to advise him throughout the hearing? She did. Didn't you? Did the counsel ever ask him for the right to interrogate? She did not. And the reason she believed that was not true. I understand what the reason is. But she was there advising him during the hearing. She never asked for the right to interrogate. She says it's because they told her she couldn't. What a case outlines that counsel must be allowed to conduct this cross. In Vannelli v. Reynolds School District. Now, the reason I want you to think very carefully, because we have a case, Crook. It's an 813 Fed Second at 98. It says where the assistance of counsel, without allowing counsel to address the hearing officer or conduct witness examination, is sufficient to allow the employee to present his case to his peers, then new process is afforded. If it's effective. And, Crook, is it? I'm not talking about effective. I'm talking is, did he allow, was he allowed to present his case to his peers? When the lawyer was asked what information she would have done differently, did she ever say anything about the hearing? She talked about more of the pre-hearing. She talked more about the list of items she would have wanted to present, right? Correct. Okay. So, was he allowed to present evidence? Was Mr. Claiborne allowed to present evidence? He was, Your Honor. Was he allowed to call witnesses? He was, Your Honor. Was he allowed to confront the adverse witness? He was. Was he allowed to confront the adverse evidence? He was, but some of it wasn't. But the bottom line is, I'm trying to determine whether, if counsel would not be allowed to address the hearing officer and counsel would not be allowed to conduct the examination, did he nonetheless get a chance to present his case? The first question is, was counsel there advising you all the way through? Yep. Second, was he allowed to present evidence? Yep. Was he allowed to call witnesses? Yep. Was he allowed to confront the witness? Yes. Was he allowed to confront the adverse evidence? Yes. All he did was he just refused to do it. So how can I suggest, then, that he was not allowed to present his case to his peers? He was allowed to present his case, but he doesn't know the manner in which he should present his case, and that's where the two issues come in. But he had his lawyer right there to the side of him. She could have said, ask this, ask that, do this, do that. If she had read what she had, but they only hired her in the morning of the hearing, she would have known she could have even done it. So you've got a lawyer there able to tell you what to do, and you're allowed to present the evidence, you're allowed to call witnesses, you're allowed to confront, but you don't, and then say, I didn't get to process. She was allowed to advise him, but there are certain documents that they didn't have until five minutes before the hearing, and those documents are particularly irrelevant in a case like this. The documents that were provided the last minute included four different interviews in the investigation that were conducted, audio recordings of those interviews. It also included audio recordings of two different meetings with Mr. Clayball and command staff and other documents that were relevant to this investigation. And the county has anybody ask for a continuance? Nobody asked for a continuance, Your Honor. The county— Anybody object? Nobody objected, Your Honor. So the lawyers there could have said, ask for a continuance. We haven't seen this till today. Ask for an object to admission of the evidence. We haven't seen this till today, but nobody did a thing. That's correct. She was asked why she didn't object, and she said because she was told that she was only there as an observer. But that doesn't say she can't get him to object. That's correct. But she was asked, and she said it was because she was told she was only there as an observer. She was told that by the sheriff, who was the hearing officer, and the human resources manager who were there. And if we're talking about is she objecting or not that we're getting to, is it a waiver? This is an argument that the county made in its most recent hearing. Let me ask you a question about this Bradshers memo. Didn't they get this Bradshers memo identifying the witnesses and what they would say by at least November 3rd, 2015? I agree it was part of that. They got a memo. I don't know that it went into the substance of what they would say. Well, I looked at the memo. That's why I said identifying the witnesses and what they would say. I think one can reasonably argue that it says that. I don't know that I would agree, but I can't say it's just out of the question. Those witnesses all submitted to interviews. There are audio recordings of those interviews that are much more detailed than what was given to Mr. Claybaugh on November 15th. In this case, there were two underlying reasons for the termination. One is Mr. Claybaugh has a communication with a co-employee. Because of that communication, the county asked him to write a memo. He writes two different memos, and essentially in his deposition he said, I wrote three because he considered his request for hearing as a third one. The issue isn't did he physically write a memo and submit that to the county. The issue is whether those memos complied with what the county asked. So when you look at that and when you look at the he said, he said of the underlying conversation, this isn't a case where documents are going to win or lose the administrative hearing. It's a question of this individual says this, this individual said that. You need to get copies of the recordings when we do these hearings. We get all of the documents. We get recordings. We listen to them. We typically have them transcribed. We use them in the cross-examination of the different witnesses. Mr. Claybaugh and his council didn't have an opportunity to do that because those documents weren't given to him until five minutes before the hearing started. Okay, so how would he have changed his approach substantively to that hearing? He would have reviewed all of those documents. Okay, but he was confronted, right, with that information. He had an opportunity to ask questions at that time. Well, he was given recordings. He didn't have an opportunity to listen to those recordings before the hearing started. They were a bunch of different documents, and Mr. Claybaugh's council buddy at the time said she was skimming through those documents at the morning of the hearing. So he's given recordings. He has absolutely no opportunity to review those. Okay, is there something that came up at the hearing that somehow he would have approached differently if he listened to those recordings? I mean, it wasn't sort of factually tense, right? I mean, it was pretty straightforward what they were claiming he was required to do and that he didn't do. It wasn't like there were 300 witnesses and scientific, you know, evidence was being presented. That's correct, but in the hearing between Mr. Claybaugh and Mr. Laird, who's the other civilian employee, the word good old boy network came up. There's an election for sheriff, and there's a comment about the good old boy network, and the real question in the administrative hearing is, was that Mr. Claybaugh's thought, or did he say this is what other people thought? And Sergeant Amon did the investigation, and in the hearing he said, I determined that Mr. Claybaugh said that. In his deposition, Mr. Amon said, I couldn't determine who said that. So there's a big distinction there. There's a lieutenant, I believe it's Lieutenant Simmons, initially recommended a 160-day suspension. That was overturned by Captain Bratcher, who recommended termination. Captain Bratcher said, if there's a 99% chance that we would not have gone through with termination if he hadn't provided the memo that we asked him to provide. And what Mr. Claybaugh said is, I provided what I could provide. I can't tell him why I think that. Well, he played a little cute on this. He didn't want to have to tell them what he thought the good old boy network was. I don't factually agree with that. Well, he came back with a definition from Wikipedia. That's not exactly in line with what he was told. I agree with that, Your Honor. But at first he was afraid to write anything about the good old boy network because he thought it would violate policies. And then he said— What policy would it have violated? I don't know that it would have. I think that's what his testimony was showing. I know he said that he thought it would violate. What policy did he think it would violate? I'm not taking that position, and we haven't really gotten down that road because I think he was inaccurate on that. But that was his initial thought. It's hard to find that obeying a direct order to provide a memo would itself violate some other directive that would get him in more trouble than not doing what he was told to do. I agree with that, Your Honor. But that was the position that he was taking at that time. I was on his counsel at that time, and that's the reason that he initially didn't want to write the memo. And then when he wrote the memo, his position then and today is that I didn't say there was a good old boy network. I said people have said there was a good old boy network. So he submits a memo, and whether he took the proper approach to that or not is— Counsel, you're in a tough position here, and I think you've handled it very, very well, very gracefully. But you're asking this court to overturn this on the basis of the due process clause of the 14th Amendment. You're asking us to tell Arizona that it violated his due process rights in the way that it conducted this hearing. Did you have a statutory remedy that you could have taken into Arizona courts? You had a statute that they very clearly had ignored. No, Your Honor, and that statute, the Arizona Police Officer's Bill of Rights, it's a fairly recent statute in the last five or so years. It's come up often that a violation of that statute does not end up violating the law. It doesn't violate the Arizona due process clause. It does not, Your Honor. It's come up a few different times. And that was an issue with the briefing. It's a factor to consider, but it's not— a violation of a state statute, even that specific state statute, doesn't create a federal due process violation. No, because it will just create a—do you have a state remedy? No, Your Honor. So Arizona wouldn't give you any relief? Correct. Well, what do we do with Cleveland Board of Education v. Loudermill, then, which says the failure to comply with a state statute does not apply— does not amount to a violation of federal due process? It's not an issue that I've litigated in state courts. It's an issue that I've researched over and over, and one of the reasons that I haven't litigated it in state court is because they repeatedly say that there's no violation of the state law, and it's something we kind of talk about and scratch our heads about. There's a policy that says that you have to do this, but you don't have to comply with it. There's a case with a very similar factual scenario out of Kentucky. It's Martin v. City of Glasgow. They also have an officer's Bill of Rights. There was a hearing there. They could comply with those Bill of Rights, and then the city determined, okay, we made a mistake. We didn't comply with it, and they gave him a new hearing. I've seen that come up a couple different times where you can get a new hearing, but when the agency digs in their heels and says, we don't have to comply with that from a federal standpoint, unfortunately they're right, and I'm not aware of any state remedy either. Would you like to reserve the remaining time? I would. Thank you, Your Honor. Mr. Korczenski. Good morning, Your Honors. At police court, my name is Mike Korczenski. I'm here on behalf of the defendant of L.E. Yuma County. I want to answer Your Honor's question about whether or not there was a state remedy. I think what Counsel's telling you is he wouldn't have wanted to figure out that case in the state court, but there's clearly a remedy or an ability to address a statutory breach in the state court or at least two climate cases in the state court. That was the nature of the Dole case that's been decided by both parties. Admittedly, it's not a police officer case, and Counsel's right. It's a very new statute, and there's no remedy for it. I mean, this is an obvious violation. Your people didn't even know about the statute, right? That's true. Innocently didn't know. It wasn't that they knew and violated it. But they could have gone back and corrected the problem. They could have gone back and corrected the problem, I believe. They could have gone back and given him a hearing that conformed to the state requirements. I'm not sure that during the whole process or until this lawsuit was started that they understood the process. They have so few of these hearings that, unfortunately, it's a small county with a relatively small staff and people who try their best earnestly. There was no allegation of any kind of intentional deprivation of rights. It was a single law that a statute that governs termination hearings of peace officers in Arizona would not be known to the peace officers in Arizona. Or their human resources folks. While the statute was known to them, the variation of the statute, they didn't know. That was the issue. They didn't have the amendment to Section 381101B2A through C, the older version of it. So did Deputy Claiborne have a right to have counsel represent him? He had a right to the assistance of counsel which he received during the hearing, meaning sort of whispering in his ear, she can't stand up, she can't cross-examine witnesses, she can't help conduct things, make objections. There's no evidence in this case to support that factual conclusion that she wouldn't be allowed. The evidence as I understand it. Well, except that she was told that she was just there as an observer. Sure, politely told by people she knew. And she knew there was another attorney whom she had had interactions with, Mr. Kirkus, in her deposition she described this. And she never approached anyone to say, hey, well, she didn't know about the notice because she had just gotten it that morning and didn't realize there was a discrepancy between what these people were politely saying was the standard practice and what she may have been entitled to and, in fact, what the county did routinely, which is allow the attorneys to help participate if such participation is needed to get the employees. That was the county's practice. Why did they tell her something different? Why did they tell her that she was just there as an observer? Well, they told her that, according to the attorney, I'm trying to remember her name, and it just spaced out and I apologize to her, but according to her own testimony in this case, she wasn't told she could be an observer. She was told she could be there and she could assist. And I think that's a categorically different. The folks back here are observing, but they're not assisting in this presentation. Some of them I suspect are going to assist otherwise. But they're not here to help the lawyers with their presentations. We might wish that that were the case, but it's not. Right, but if she's told that she can assist, then she can whisper in his ear, but she can't stand up and object and she can't stand up and say, okay, I've got a couple of questions I'd like to ask the witness. Well, but, Your Honor, that doesn't constitute a denalogy process in this case. Those statements, those polite statements, as everybody has recognized, that they don't allow or they don't like when the attorneys start taking over the hearings. If she had read the actual notice. Have they let attorneys in other hearings ask questions? I don't want to speak outside the record. I don't think that question was asked. Questions relative to whether they allowed continuances on a generous basis were asked and undisputedly answered yes. Questions about, you know, honestly, I think that question was asked. I just don't remember what the answer was. So when was the first time that the governmental entity realized that they didn't follow Arizona law? On the peace officers' bill of rights or whatever it's called? I want to be careful, and I don't want to be circular. I know that answer, but I know it because I was told it. I don't think it's part of the record. Did Mr. Griffin file some letters, I think, in February of 2013? Yes. I know, and there's nothing in the record that suggests before they got those letters, they understood that those requirements apply. Did anybody respond to those letters? Yes. Mr. Kirk has responded to one, and then I was brought in to assist either after the letter or shortly after the lawsuit was filed. There is in the record, however, Viz Rico testified that after they received the letters, they changed their process to include the requirements of 1101B. But they didn't offer a new hearing, though. They did not offer a new hearing, but I don't know of a case or a statute in Arizona that would require them to do so. Under the due process clause now, the remedy would be to have gotten an inductive hearing in state court to have a new hearing. Mr. Orszanski, if Deputy Claybaugh had been accused of driving his state vehicle under the influence, you know, yeah, he'd be entitled to a hearing, and we might be a little less concerned with all of the niceties of Arizona procedure that were not followed in this case, because it would be pretty obvious what you do there. I have to say, Huma looks pretty thin-skinned here in this case. Respectfully, Your Honor, I have a couple of points relative to that question. One is I don't think that's a matter of issue. No, I understand that, but it certainly provides the context for the fact that Deputy Claybaugh doesn't look like he was not provided his statutory rights, and that in general he wasn't treated with respect to this hearing the way that we expect people to be treated. If you're going to raise matters in the hearing, we expect people to be given notice and an opportunity to comment on those matters. In a hearing as serious as this that relates to termination, Goldberg v. Kelly tells us in the public welfare area, we may need to afford people the opportunity to bring counsel in if they wish it or have somebody else assist them. Surely in a termination hearing that has such great consequences for Deputy Claybaugh, it wouldn't be a surprise to anybody that he might be useful to have counsel there. I will try to respond to a couple of different points I think Your Honor is making. I want to go back to the thin material in which the charges were brought. I made my single point, and I'd like to make my responsive point. In terms of I have a harder time thinking of somebody in the public sphere, except maybe judges who are in the government sphere, who are more visible to the public than police officers and prosecutors. I can't think of people who have more contact with those two agencies, and I can't think of an agency on a day-to-day basis. I'm leaving out the military, but on a day-to-day basis puts their lives on the line and has to follow a civilized, reasonable command structure in order to accomplish this task and come home alive. So I think this was a pretty hotly contested sheriff's race between Wilmot and Zinkel. I think that's fair. I don't know. This was a conversation between two employees at the motor pool, two employees of the county, and one favored one of them, and one of them favored the other. And one of them tattles, and boom, the debate gets camped. Well, again, very respectfully, Your Honor, the disciplinary proceedings were not brought based upon the conversation. And it wasn't brought because there was a conversation about it in the debate. It was brought because somebody, admittedly, the only person who brought up the good old boy statement was Mr. Klaybaugh. He was the only one. If he's a uniformed officer speaking in a uniform, having just gotten out of his car, talking to a non-uniformed employee, that bears a certain level of responsibility, part of which is to not disparage the very people who their lives and yours may depend on. As Mr. Klaybaugh agreed, categorically, discipline, including termination, were appropriate as he understood the rules under which he had worked. If he had made that statement and owned it, he was asked that question flat out. He didn't flag. He didn't waver. He said, yes. If somebody, if I made that statement, good old boys, I would be subject to discipline up to and including termination. The orders that were given to him presumed the story of the guy in the motor pool. That is, they presumed the reference to good old boy was Klaybaugh and not Klaybaugh saying, I've heard from others that there's a good old boy network. And so then he's asked to explain what the problems are with the good old boy network. That means that somebody has resolved a factual issue against him. He's been ordered to answer something that he may not have said. I might perspectively disagree with the word resolved. It may be a starting point. Hey, we heard you said this. If you haven't, tell us. But in the memos, he said he didn't say it. And then they said, well, now you've been insubordinate because you didn't answer the question we asked you, which was to explain what the good old boy network means. Perspectively, that's not correct. In the first memo, the first type, he was verbally ordered to A, explain what happened, and B, explain what was meant by the good old boys, a word he's agreed, the term agreed that he used in the statement. His answer was nonresponsive. There was nothing about good old boy. His written statement to Lieutenant Simmons did not contain that word or state. What eventually became his story, which is, oh, I didn't say that, or, well, I did say that, but it was in reference to what somebody else said, and I made it perfectly clear I wasn't owning that statement. If that were the case, why wouldn't he have written that the first time? Say, whoa, whoa, whoa, you guys are off on the wrong track. Yeah, I said it, but I wasn't referencing that as my statement. I was referencing it as a statement of others. I think those weighing the credibility of those excuses that come not in that first memo but in later memos is left to the administrative process and the administrative body. But even if you were to reevaluate that, I think you have to look at some suspicion at the evolution of his at first refusal to even admit or tacit refusal to admit he made the statement and then later admission that he made it and why he made it or how he made it. So I have to disagree with the factual predicate because it does come up in later memos but not in that first memo. That's why he's directed to do it again. And in the second direction that he gets, the second order he gets, he doesn't write any memo. He simply says, I won't do it unless I get that order in writing. As an ex-marine and as a police officer for five years, he knows that verbal orders from commanders and verbal orders from his superiors in his chain of command are to be carried out unless there is a morally repugnant reason for not doing. He admitted as much in his deposition. Well, chain of command is really important, so I don't think we're quarreling with that. But this is a pretty, it's the ultimate disciplinary action, which is termination. And so that's the whole issue is that you have this termination hearing. You know, he's, it's obviously, you know, a confluence of terrible things that's happened. He's not given all of the documents to write before. He gets a last-minute replacement with whoever is going to represent him in the hearing. That person, Ms. McDonald was told she's to be an observer and so forth. So our question is, then later on, you know, the county finds out, well, we didn't follow Arizona law. At that point, you know, why isn't he given a new hearing? I mean, why are we even here on a federal due process claim when there's a state law that he could have raised? And like you said, you know, maybe he should have gone for injunctive relief or what have you. But at that point, why doesn't the county do this? Especially over something as important as chain of command is. Over a stupid statement that would not have been sure as was attributed directly to Mr. Clay Hall. Or that he ever admitted that he said it. You know, your answer, your answer, your honor, my answer's going to sound trite and I don't want it to. I'm going to give you my answer and then the explanation. Because they weren't asked to. Now, that's important contextually because the letters they got from counsel were saying, you didn't give him a post-deprivation hearing. Not that you gave him one and there was a failure in it. That came up later in the course of things. So I suspect, I wasn't there, I can't answer that question, I wasn't asked in this case. But I think it's, there's no evidence that it was out of malice or any desire to uphold a process that hadn't worked in accordance with due process. So I think it's easy in hindsight to say, hey, why didn't you just turn around and realize you didn't give him due process and redo it at some point later. Well, they requested, they reviewed the matter pursuant to Arizona law section 38-1101K. Right, those procedures, as Judge Holland correctly pointed out, apply to post-deprivation matters. What was being argued, or I believe was in the letters from counsel, was, hey, we need a post-deprivation hearing. We want a post-deprivation hearing. And we want it conducted by these rules. Well, if this was a pre-deprivation hearing, as was counsel's position in those letters, I believe, and counsel can answer that, I shouldn't be doing that for him. But at least I understood it to be, if this was a, I'm out of time. I don't want to. I don't think there are any further questions. Thank you, Mr. Morrison. Thank you very much. Mr. Griffin. Thank you. Regarding the follow-up request for a hearing, the hearing was on November 30th. On December 7th of 2012, the determination became effective. In ER 265, on December 17th of 2012, my firm sends a letter to Yuma County requesting a hearing. It was a fairly brief letter, and it's in pursuance of ARS 38-1101-D1. Ten days later, an attorney for the county, Bill Kirkus, contacted me via telephone. We had a communication about what our request was and the specifics of 1101. He said he'd get back to me. He didn't get back to me. On February 13th of 2013, and it's ER 263 and 264, is a more detailed letter from me addressing 1501, why the initial hearing, if it was a post-termination hearing, was deficient. It concluded by asking the county that if they believe that it complied with the police officer's Bill of Rights, or it doesn't have to comply, to provide me any documents or authority on that. We never heard anything back. We had no choice but to file a lawsuit on that. Did you ever submit any additional information after the hearing? I did not, Your Honor, and my firm did the lawyer. I mean, she was asked what she would have done differently if she'd had the chance to see the notice before, and the only thing she said was she would have offered a list of additional items she would have wanted to present. Did she ever offer those? She did not, Your Honor. In her deposition, she testified that she believed that it was a pre-termination hearing, and I believe that's the reason that she didn't offer anything else. Touching briefly upon the representation of counsel, I think it's important, this Court's decision in Benelli v. Reynolds School District, it's an employment context case, it's a post-termination case, and in that opinion, this Court cited to Goldberg regarding the opportunity to be heard. There, it was determined that the post-termination hearing was sufficient, and one of the specifically listed factors was that Mr. Benelli had an attorney. He was able to represent him in that hearing. He was able to cross-examine all of the witnesses who were presented when witness wasn't there, and in Goldberg, there's a list of things that counsel can do. They can help delineate the issues. They can present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient. Goldberg has been brought into the employment law context in Benelli, and that was not done here. Thank you. Thank you. We thank both counsel for the argument. Claiborne, Mississippi County Appeal, in order to submit it.
judges: Bybee, N.R. Smith, Kobayashi